**In re Rosemary SHARON dba Sharon's Janitorial, Debtor.**

**Bankruptcy No. 96–31035.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

July 30, 1996.

Harold Jarnicki, Lebanon, OH, Stephen D. Miles, Dayton, OH, Phyllis A. Ulrich, Cleveland, OH, for Debtor.

George W. Ledford, Chapter 13 Trustee, Englewood, OH.

### DECISION CONFIRMING PLAN, DETERMINING RELIEF FROM STAY, VALUATION, AND ADEQUATE PROTECTION ISSUES, FINDING STAY VIOLATION AND FIXING DAMAGE AWARD

THOMAS F. WALDRON, Bankruptcy Judge.

This proceeding, which arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Standing Order of Reference entered in this district on July 30, 1984, is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)—matters concerning the administration of the estate, (B)—allowance or disallowance of claims against the estate, (C)—counterclaims by the estate against persons filing claims against the estate, (E)—orders to turn over property of the estate, (G)—motions to terminate, annul, or modify the automatic stay, (K)—determinations of the validity, extent, or priority of liens, (L)—confirmation of plans and (O)—other proceedings affecting the adjustment of debtor-creditor relations.

### INTRODUCTION OF ISSUES PRESENTED

The issues presented by this proceeding have generated an abundance of case law with varied analyses and results. This court has determined that it is appropriate to publish its determination of the issues presented,

not to add additional weight to an arguably unnecessarily large body of case law, but to clarify current positions on these issues and provide guidance to interested parties who will repeatedly encounter them in chapter 13 practice. The following issues will be addressed in the order listed: 1) Where a vehicle is repossessed prepetition, does a secured creditor violate the automatic stay by failing to comply with a chapter 13 debtor's postpetition request for its return, specifically when proof of insurance on the vehicle has been provided; and what are the appropriate standards governing relief from stay and adequate protection in such circumstances?; 2) What are the appropriate standards for resolving disputed valuation of a vehicle where the debtor proposes to retain it as part of a chapter 13 reorganization?; 3) What are the applicable standards governing confirmation of a proposed plan where a chapter 13 petition is filed a short time after the debtor has purchased and taken possession of a vehicle pursuant to an installment sales contract, but does not propose to pay the claim in full or in accordance with the interest rate specified in the installment sales contract?; and 4) What is the appropriate burden of proof and measure of damages for violations of the automatic stay?

## STATEMENT OF THE FACTS

The debtor's uncontroverted testimony, which the court finds credible, and the documents introduced without objection, establish the following facts. Rosemary Sharon dba Sharon's Janitorial (the "Debtor") filed a voluntary petition for relief under 11 U.S.C. § 1301 [1] *et seq.* on March 11, 1996. The plan provides the Debtor will pay $1,000 per month for a sixty (60) month period, pursuant to a pot plan [2] which projects a 24% distribution to unsecured creditors. TranSouth Financial Corporation ("TranSouth") financed the Debtor's purchase of a 1995 Mitsubishi 3000 GT automobile (the "Vehicle") and was listed in the Debtor's schedules as a creditor holding a claim secured by the

Vehicle. The Debtor paid $3,450 as a down payment, signed a Retail Installment Contract and Security Agreement dated November 30, 1995 (the "Agreement") and granted a security interest in the Vehicle to TranSouth. TranSouth perfected its interest in the Vehicle and is listed as the first lienholder on the Ohio Certificate of Title. The Agreement required the Debtor to remit to TranSouth monthly payments of approximately $984 with the first payment due on January 1, 1996. The Debtor made the first payment pursuant to the Agreement, and a check for the second payment was tendered. The Debtor was in the process of changing banks when the second payment became due. Because the check for the second payment did not clear prior to the Debtor's former bank account being closed, the Debtor was in default under the terms of the Agreement. A TranSouth representative contacted the Debtor to advise her that she was in default and that the Vehicle would be repossessed unless TranSouth received two (2) payments, one for the month of February 1996 and one for the month of March 1996. Although the Debtor submitted the two (2) payments in a check drawn on her new bank account, TranSouth repossessed the Vehicle before the check could clear. In response to the repossession, the Debtor stopped payment on the check and contacted counsel.

On the same day the Debtor filed her chapter 13 petition, counsel for the Debtor advised TranSouth representative Davey Havenor ("Havenor") by telephone of the Debtor's filing and requested the return of the Vehicle. Counsel for the Debtor also telephoned Ed Rogers, a TranSouth customer service representative on March 11, 1996, relayed the same information regarding the Debtor's filing of a bankruptcy petition, and requested the return of the Vehicle. In a second telephone conversation between counsel for the Debtor and Havenor on the same date, Havenor requested a copy of the Debtor's schedules and verification of insurance. The Debtor complied with the request by

---

1.  Unless otherwise indicated, all section and rule references are to the current Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code") and the current Federal Rules of Bankruptcy Procedure, Rule 1001 et seq.

2.  See *In re Witkowski*, 16 F.3d 739, 747–48 (7th Cir.1994) discussing the significance of pot plans in chapter 13 cases.

faxing a copy of the insurance declaration and the name of the Debtor's insurance agent to TranSouth. Counsel for the Debtor verified TranSouth's receipt of the requested information and renewed his request for the return of the Vehicle in a third telephone call made to Havenor on March 11, 1996. Counsel for the Debtor also telephoned TranSouth's attorney, Wade Holliday ("Holliday"), on March 11, 1996 and left a message at his Dallas, Texas office. The following day, counsel for the Debtor made two (2) telephone calls to Holliday requesting the return of the Vehicle, and faxed Holliday a copy of the Debtor's schedules.

Although the Debtor provided TranSouth with the case number, copies of the filed schedules, and proof of insurance, the Vehicle was not returned. The Debtor filed a Motion for Contempt and Sanctions for Violation of the Automatic Stay (Doc. 5–1) ("Debtor's Motion") on March 15, 1996 together with a Motion for an Expedited Hearing (Doc. 6–1).

A hearing was scheduled (Doc. 7–1) for March 21, 1996 on the Debtor's Motion. On the day of the scheduled hearing, TranSouth filed a Motion for Relief from Automatic Stay Imposed Under Section 362 or in the Alternative for Adequate Protection and Brief in Opposition to Motion for Contempt and Sanctions for Violation of Automatic Stay ("TranSouth's Motion for Relief from Stay or Adequate Protection") (Doc. 8–1).[3] As the basis for its Motion for Relief from Stay or Adequate Protection, TranSouth alleged that the Vehicle was not necessary for an effective reorganization, and that its interest in the Vehicle was not adequately protected. Noting the "state of decline in the value" of the Vehicle, TranSouth's Motion for Relief from Stay or Adequate Protection requested that the Debtor be required to provide TranSouth with adequate protection payments and proof of insurance in the event that the court should require TranSouth to return the Vehicle to the Debtor. TranSouth additionally contended that the Vehicle was a luxury car "beyond contemplation of the protection of the bankruptcy code" and that the Debtor could "easily afford an alternative, far less expensive, form of transportation than a Mitsubishi 3000 GT" to travel to and from her job.

After the March 21, 1996 hearing, this court entered an Order Requiring Return of Vehicle (Doc. 10–1), which provided that issues related to damages of the Debtor would be heard at the same time as the hearing on TranSouth's Motion for Relief from Stay or Adequate Protection. The Vehicle was returned to the Debtor on March 22, 1996.

On March 26, 1996, this court entered a subsequent Order Setting Hearing and Requiring Filings (Doc. 13–1) which scheduled a hearing on TranSouth's Motion for Relief from Stay or Adequate Protection for April 18, 1996. At the request of the Debtor, the hearing was rescheduled to April 22, 1996. The March 26, 1996 order also required counsel for the Debtor to file with the court a specific listing of actual damages claimed on behalf of the Debtor, as well as a specific listing of attorney fees and costs claimed.

Pursuant to this court's March 26, 1996 order, Debtor's List of Damages Sought for Stay Violation and Other Relief (Doc. 18–1) ("Debtor's List of Damages") was filed on April 2, 1996. Attached to the Debtor's List of Damages was a log of time spent and attorney fees claimed by the counsel for the Debtor as a result of TranSouth's refusal to return the Vehicle[4]. Also enumerated in the Debtor's List of Damages were claims for storage and towing fees amounting to $154

---

**3.** At the March 21, 1996 hearing, counsel for TranSouth relied upon *In re Sutton*, 87 B.R. 46 (Bankr.S.D.Ohio 1988), an opinion published by Chief Judge Clark of this court. In *Sutton*, the court held that a creditor who repossessed a debtor's automobile prepetition was under no obligation to return the automobile postpetition, so long as the debtor remained uninsured. The factual situation in this case is exactly the opposite: here the Vehicle was insured and proof of insurance was supplied at the same time the Debtor requested the return of the Vehicle. As the first sentence of the *Sutton* opinion states, "[t]he controlling facts in the disposition of this case are that plaintiff's automobile was uninsured at the time she filed her petition in bankruptcy *and that the vehicle was made available to her upon proof of insurance.*" *Sutton*, 87 B.R. at 46 (emphasis supplied). *Sutton* supports the Debtor's position, not TranSouth's position.

**4.** A copy of counsel for the Debtor's time log is attached as exhibit A to this opinion.

and punitive damages of $7,500. On April 16, 1996, a Brief of TranSouth Financial Corporation in Opposition to Debtor's List of Damages Sought for Violation and Other Relief Sought ("Brief in Opposition") (Doc. 23–1) was filed. In the Brief in Opposition, TranSouth argued that it did not refuse to return the Vehicle and therefore did not willfully violate the automatic stay. Instead, TranSouth asserted that negotiation for return of the Vehicle in exchange for adequate protection was contemplated by § 362(e) and that the return of the Vehicle could be conditioned upon same. If the Debtor incurred expenses due to its actions, TranSouth contended that such expenses resulted from "Debtor's misinterpretation of TranSouth's attempt to obtain adequate insurance". TranSouth also disputed the Debtor's claim for punitive damages and alleged that the itemization of the actual damages was inflated.

The Debtor's chapter 13 plan, filed contemporaneously with her petition, listed the Vehicle as having a value of $23,500. On April 10, 1996, TranSouth filed an Objection to Proposed Valuation of Motor Vehicle (Doc. 21–1) ("TranSouth's Objection to Valuation") claiming that the Vehicle should be valued at $25,050 because the Vehicle was purchased new and was equipped with leather interior, custom wheels, and a sunroof. TranSouth additionally contended that the Agreement contained an extended mechanical service contract (the "Service Contract"), valued at $1,200, which was an executory contract that the Debtor's plan failed to either assume or reject pursuant to § 365. TranSouth also filed an Objection to Confirmation of Chapter 13 Plan (Doc. 22–1) ("TranSouth's Objection to Confirmation") which argued that: 1) the Debtor understated the fair market value of the Vehicle; 2) TranSouth would not receive sufficient funds from the Debtor to pay the present value of the Vehicle over the life of the plan; 3) the Debtor failed to assume or reject the Service Contract pursuant to § 365; and 4) the Debtor's plan was not proposed in good faith.

In accordance with the evidence and arguments presented, and the agreement of counsel for the parties at the April 22, 1996 hearing, the court entered an order on April 23, 1996 (Doc. 29–1) which scheduled a hearing for June 14, 1996 to determine automatic stay/adequate protection issues, confirmation issues, valuation issues, issues related to the Service Contract, and any damages to be awarded against TranSouth for violation of the stay. After the June 14, 1996 hearing, the court entered an order dated June 17, 1996 (Doc. 38–1) setting July 15, 1996 as the final date for the parties to file memoranda for consideration in connection with the resolution of the issue of good faith pursuant to 11 U.S.C. § 1325(a)(3). Pursuant to the June 17, 1996 order, TranSouth filed a brief (Doc. 39–1) on July 12, 1996.

Based on the evidence presented at the June 14, 1996 hearing, the filings of the parties, and for the reasons set forth below, the court confirms the Debtor's proposed plan and makes the following determinations: 1) TranSouth violated the automatic stay when it refused to return the Vehicle upon the Debtor's request, particularly when presented with proof of insurance; 2) TranSouth is not entitled to relief from stay pursuant to § 362(d)(1) or (d)(2) since there is no cause to grant relief from stay, the Vehicle is necessary for an effective reorganization, and the confirmed plan's payments and maintenance of insurance provide adequate protection; 3) the appropriate standard for resolving disputed valuation of a vehicle is governed by the local rule which provides that the general standard for resolving disputed valuation of motor vehicles shall be the average of the trade-in value and retail value, including options, contained in the Central Edition of the N.A.D.A. Official Used Car Guide for the month the debtor's petition was filed, or the most recent National Edition of the Appraisal Guides for Older Cars, for Older R.V.s, and Older Motorcycles, subject to the opportunity for the presentation of specific evidence concerning the particular vehicle; 4) the standards governing confirmation of a proposed plan where a chapter 13 petition is filed a short time after the debtor has purchased and taken possession of a vehicle pursuant to an installment sales contract, but the plan does not propose to pay the claim in full or in accordance with the interest rate specified in the installment sales contract,

are set forth in the line of cases beginning with *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982), modified in *In re Okoreeh–Baah*, 836 F.2d 1030 (6th Cir. 1988) and most recently reflected in *In re Mitchell*, 191 B.R. 957 (Bankr.M.D.Ga.1995); 5) the appropriate burden of proof for violations of the automatic stay pursuant to § 362(h) is a preponderance of the evidence; and 6) the Debtor is entitled to recover actual damages, including costs and attorney fees pursuant to § 362(h), but the court declines to award punitive or exemplary damages.

## DISCUSSION

### A. THE AUTOMATIC STAY

■■■ The filing of a petition commencing a bankruptcy case creates an estate composed of all legal or equitable interests of the debtor in property wherever located and by whomever held as of the commencement of the case. 11 U.S.C. § 541. The scope of § 541(a) is broad and includes both tangible and intangible property. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). Further, in chapter 13 reorganization cases, the expansive definition of property of the estate found in § 541 is enhanced by § 1306(a).[5] The court holds that the Debtor's Vehicle, specifically its possession and use, is property of the estate.

A creditor who has lawfully seized a vehicle prepetition, but refuses to turn over the vehicle upon a chapter 13 debtor's postpetition demand, violates the automatic stay. This determination is compelled by the plain meaning of the Bankruptcy Code and Rules, supported by Supreme Court authority, and consistent with the conclusion reached by a majority of the courts which have considered the issue. The court holds that the language of §§ 361, 362, 363, 542 and Rule 4001(d), together with the overall structure of the Code, compel the conclusion that TranSouth

violated provisions of the automatic stay in the circumstances of this case.

In *United States v. Ron Pair Enterp., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court held that where the statutory scheme is coherent and consistent, there is no need for a court to inquire beyond the plain language. See also *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) where the Supreme Court stated, "[w]e have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."

The critical language under scrutiny for purposes of the present analysis is found in § 362(a)(3). Once a bankruptcy petition has been filed, § 362(a)(3) prohibits a creditor from taking "any act to obtain possession of property of the estate or of property from the estate *or to exercise control over property of the estate*". 11 U.S.C. § 362(a)(3) (emphasis supplied). This clause was added as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Amendments") to the then existing language of § 362(a)(3) which stayed "any act to obtain possession of property of the estate or of property from the estate". The amendment was designed to broaden the scope of the stay. Collier's Bankr.Manual, ¶ 362.03 at 362–19, 362–20 (3rd ed.1989). The 1984 Amendments expanded the proscription of § 362(a)(3) to encompass acts which "exercise control" over property of the estate in addition to affirmative acts to "obtain possession" of such property.

■■■ This court holds that the phrase "exercise control" encompasses acts of a creditor in denying a chapter 13 debtor possession and use of a debtor's vehicle when the return of the property has been requested. As the phrase implies, actual possession consists of

---

**5.** 11 U.S.C. § 1306(a) provides:

Property of the estate includes, in addition to the property specified in section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under

chapter 7, 11, or 12 of this title, whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

the exercise of dominion or control over property. See *In re Knaus*, 889 F.2d 773 (8th Cir.1989); *Carr v. Security Savings & Loan Association*, 130 B.R. 434 (D.N.J.1991); *In re Dungey*, 99 B.R. 814 (Bankr.S.D.Ohio 1989). It is uncontroverted that in this case TranSouth exercised control over the Vehicle and denied the Debtor possession and use of estate property when it repeatedly refused to return the Vehicle.

■ Central to the resolution of the issues presented in this matter is the statutory scheme of § 362, a procedural provision, and its interplay with related substantive sections of the Code. The moment a debtor files a bankruptcy petition, a congressionally mandated order is automatically entered which operates as a stay, applicable to all entities, of all creditor activity. 11 U.S.C. § 362(a). The stay is effective upon the date of the filing of the petition; formal service of process is not required. *In re Smith*, 876 F.2d 524, 526 (6th Cir.1989). Section § 362(a) clearly begins with the premise that the filing of a bankruptcy petition operates as a stay of all creditor activity not specifically excepted in § 362(b). Unless the stay does not apply pursuant to § 362(b), or has terminated pursuant to § 362(c), the provisions of the Code require the creditor, not the debtor, to take affirmative action pursuant to § 362(d) to obtain relief from stay or adequate protection by filing a request in the bankruptcy court. In the absence of affirmative action on the part of the creditor to utilize § 362(d) to obtain relief from stay, § 362(a) prevents the very creditor action that would be permitted if the court were to grant a creditor's request for relief. Sections 362(d) and (e) provide that at the request of a party in interest, and after notice and a hearing, the court shall, if certain conditions are met, grant relief from the stay by terminating, annulling, modifying or conditioning such stay within thirty (30) days after a request for relief has been filed. Upon request of a party in interest, § 362(f) provides that the court can grant relief from stay even without holding a hearing where certain conditions exist. In the absence of such affirmative action by a creditor, the provisions of § 362(a) apply.

As previously noted in *Matter of Brock*, 58 B.R. 797, 804 (Bankr.S.D.Ohio 1986):

> While these provisions provide an opportunity for relief from the stay, and do so in an expedited and in some cases in an immediate fashion, they do not authorize a party to ignore the provisions of the automatic stay and to proceed, without a determination by the bankruptcy court, against the debtor, any property of the estate, or any other property of the debtor until such property has been determined not to be property of the estate. These determinations belong exclusively to the bankruptcy court and in the absence of an order of relief entered by the bankruptcy court a creditor and creditor's counsel proceed at their peril.

*Matter of Hughes–Bechtol, Inc.*, 117 B.R. 890, 906 (Bankr.S.D.Ohio 1990) recognized that "while the automatic stay may impact on the substantive rights of creditors, the purpose of the automatic stay is not substantive, but procedural" and, in reorganization cases, is intended to enable the debtor to prepare and present a proposed plan free from unauthorized creditor pressure. The court stated that "the purpose of the automatic stay is not to ultimately determine the substantive rights of any party, nor to ultimately prevent the exercise of the available rights of any party" and noted that "[a] great number of the actions prohibited by the automatic stay (seizures, foreclosures, statutory notices and demands) may be permitted when the automatic stay no longer applies." 117 B.R. at 906. The court further noted that:

> Congress placed the court at the vortex of the bankruptcy proceedings and the provisions of the automatic stay are designed as the initial channels that regulate the flow of economic consequences, which, if left unchecked or diverted by extra judicial determinations, would drown a debtor's opportunity for a fresh start and would destroy a creditor's opportunity to receive its hierarchically ordered claim to a pro rata share of the bankruptcy estate. Unless a particular proceeding is specifically designated an exception to the automatic stay (§ 362(b)), a creditor is obligated to obtain relief from stay *prior* to taking any action

involving property of the estate. To the extent creditors fail to do so, they act at their own peril.

*Hughes–Bechtol,* 117 B.R. at 906 (emphasis in original).

■ The interface of the procedural provisions of § 362 with other provisions of the Code determinative of substantive rights provide further support for this court's conclusion that a creditor must file a motion seeking relief as a condition precedent to obtaining adequate protection. Section 361 titled "Adequate Protection" begins by stating, *"[w]hen adequate protection is required under section 362, 363, or 364* of this title of an interest of an entity in property" before it identifies three (3) ways adequate protection may be provided. 11 U.S.C. § 361 (emphasis supplied). The structure of § 361, specifically the introductory clause, supports the conclusion that adequate protection is only available *after* a motion has been filed with the bankruptcy court.

Additional support is offered by § 363(c)(1) [6] which allows the debtor to use property of the estate in the ordinary course of the debtor's business without notice or a hearing. Except in one specified circumstance, the Code requires no preliminary action by the debtor to use property of the estate. To demonstrate how Congress could have provided a specific requirement compelling a debtor, rather than a creditor, to take affirmative action and file the first pleading, see § 363(c)(2) [7] which governs the use of cash collateral and requires the debtor, rather than the creditor, to initiate a proceeding

to obtain an order from the bankruptcy court.

■ Pursuant to § 363(e), an entity with an interest in the property used by the trustee or the debtor may request the court to prohibit or condition such use as is necessary to provide adequate protection of such interest. But in the absence of such a request, the debtor is free to use property of the estate (except cash collateral) without obtaining a court order and, certainly, without obtaining a creditor's permission. In enacting the Code, Congress chose to place the burden on the entity with an interest in the property to take affirmative action to restrict a debtor's use of property of the estate. This placement of an affirmative duty on the creditor, rather than the debtor, is consistent with the interpretation of § 362(a)(3) adopted by this court.

Like § 363, § 542(a) [8] titled "Turnover of property to the estate" requires no preliminary action on the part of the debtor. The statute contains no provision requiring adequate protection as a prerequisite to turnover. Under § 542(a), an entity in possession, custody or control of property that the debtor or the trustee may use, sell or lease under § 363 "shall" deliver such property to the trustee unless such property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a).

Even in those circumstances where a debtor and creditor have reached an agreement relating to relief from the automatic stay, prohibiting or conditioning the use of property, or providing adequate protection, Bankruptcy Rule 4001(d) requires that a motion,

6. 11 U.S.C. § 363(c)(1) provides:
   If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

7. 11 U.S.C. § 363(c)(2) provides:
   The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
   (A) each entity that has an interest in such cash collateral consents; or

   (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

8. 11 U.S.C. § 542(a) provides:
   Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

to which the agreement "shall" be attached, must be filed with the court and served on certain parties. Regardless of whether an objection to the agreement is filed, the court *"may enter an order approving or disapproving the agreement without conducting a hearing."* Fed.R.Bankr.P. 4001(d) (emphasis supplied).

The court finds that the statutory scheme of the Code contained in §§ 361, 362, 363, and 542, complemented by Bankruptcy Rule 4001(d), together with the required plain meaning analysis mandated by the Supreme Court, compel the conclusion that, in the absence of a *court* determination of adequate protection, a secured creditor that lawfully prepetition obtained a debtor's vehicle violates the automatic stay by refusing a postpetition request to turn over the vehicle to the debtor.[9]

This court recognizes that the prohibition in § 362(a)(3) was recently examined in a thoughtful and extended analysis by the bankruptcy court in *In re Young*, 193 B.R. 620 (Bankr.D.Dist.Col.1996). The *Young* court concluded the section was "ambiguous", and suggested that the split of authority which has developed on the scope of the phrase "to exercise control" supplied proof of the phrase's ambiguity. *Young*, 193 B.R. at 624. Having found that § 362(a)(3) was ambiguous, the *Young* court determined it was required to apply the long held rule that "[when] Congress amends the bankruptcy laws, it does not write 'on a clean slate'". Citing *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990), the *Young* court noted that the Supreme Court "has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in legislative history." *Young*, 193 B.R. at 624. The *Young* court contended that the Supreme Court was well

aware when it decided *Whiting Pools* that common bankruptcy practice conditioned turnover orders on proof of adequate protection and did not question the propriety of that procedure. See *In re Young*, 193 B.R. at 622 footnote 3, citing *In re Purbeck & Assoc., Ltd.*, 12 B.R. 406, 408 (Bankr.D.Conn. 1981) and at 626 collecting cases.

At a minimum, it appears that bankruptcy courts approved of differing practices concerning adequate protection when *Whiting Pools* was decided. Reported bankruptcy decisions *did require* the turnover of a debtor's vehicle without providing adequate protection. *In re Purbeck & Assoc., Ltd.*, a 1981 decision concerning a chapter 7 trustee's turnover action, concludes "[t]he plaintiff is entitled to an order requiring the defendant to immediately deliver the jeep to the plaintiff without the necessity of the providing the defendant with adequate protection." *Purbeck*, 12 B.R. at 410. The reported decision immediately preceding *Purbeck* in the Bankruptcy Reporter, *Matter of Endres*, 12 B.R. 404 (Bankr.E.D.Wis.1981), provides another example of the adequate protection procedures employed by bankruptcy courts prior to the decision in *Whiting Pools*. In *Matter of Endres*, a case commenced under chapter 13, the court concluded:

> This court agrees that repossession prior to actual knowledge of the filing of the bankruptcy petition is not contemptible. However, this court finds that refusal to return the property upon learning of the proceeding is a willful violation of the stay provisions and may be contemptible. *In re Miller*, 10 B.R. 778 (Bkrtcy.D.Md.1981).
>
> FMCC argues that they are only protecting their interest in the automobile. This court finds such interest could have been protected by an order of this court after the filing of a proper action.

*Matter of Endres*, 12 B.R. at 406.

The 1983 *Whiting Pools* decision obviously preceded the 1984 Amendments and there-

9. The court notes that TranSouth's action also violated §§ 362(a)(1), 362(a)(4), 362(a)(5) and 362(a)(6) respectively because it was the "continuation" of an "action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title", and an "act to create, perfect, or enforce any lien against property of the estate", and an

"act to ... enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title", and an "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title". See 11 U.S.C. §§ 362(a)(1), 362(a)(4), 362(a)(5) and 362(a)(6).

fore could not, and does not, contain an analysis of the "exercise control" language added to § 362(a)(3). Similarly, *Whiting Pools* could not have considered the 1987 addition of paragraph (d) to Bankruptcy Rule 4001.

The majority of courts have interpreted § 362(a)(3) to mean that any postpetition retention of a debtor's property violates the automatic stay and is sanctionable. See *Knaus v. Concordia Lumber Co., Inc. (In re Knaus),* 889 F.2d 773 (8th Cir.1989); *In re Abrams,* 127 B.R. 239 (9th Cir. BAP1991); *General Motors Acceptance Corp. v. Ryan (In re Ryan),* 183 B.R. 288 (M.D.Fla.1995); *Carr v. Security Savings & Loan Association,* 130 B.R. 434 (D.N.J.1991); *In re Coats,* 168 B.R. 159 (Bankr.S.D.Tex.1993); *In re Holman,* 92 B.R. 764 (Bankr.S.D.Ohio 1988); *In re Carlsen,* 63 B.R. 706 (Bankr.C.D.Cal. 1986). Even after the 1984 Amendments, a minority of courts have reached the opposite conclusion and concluded instead that § 362(a)(3) mandates affirmative action on the part of the debtor to provide "adequate protection" satisfactory to the creditor in order obtain the return of estate property seized prepetition. See *In re Young,* 193 B.R. 620 (Bankr.D.Dist.Col.1996); *In re Deiss,* 166 B.R. 92 (Bankr.S.D.Tex.1994); *In re Najafi,* 154 B.R. 185, 194–95 (Bankr. E.D.Pa.1993); *In re Richardson,* 135 B.R. 256 (Bankr.E.D.Tex.1992). At the outset, the court notes that its interpretation of the post–1984 Amendment version of § 362(a)(3), in conjunction with the overall structure of the Code, is most consistent with the conclusion reached by the majority of courts to consider the issue. Both lines of cases cite *Whiting Pools* as support for their respective, but conflicting, positions. In an effort to explain, if not resolve, the conflict, this court has undertaken an analysis of that decision.

In *Whiting Pools,* the IRS seized, prepetition, the tangible personal property of Whiting Pools, Inc. ("Whiting") pursuant to a levy and distraint provision of the Internal Revenue Code. The day after the seizure, Whiting filed a petition for reorganization under chapter 11 and was continued as debtor in possession. The IRS filed a motion in the bankruptcy court for a declaration that § 362(a) was inapplicable, or alternatively, for relief from the automatic stay.[10] Whiting counterclaimed for an order requiring turnover of the seized property pursuant to § 542(a), intending to use it in its reorganized business.

The bankruptcy court determined that the IRS was bound by § 362(a), but refused to grant the IRS relief from stay because the seized property was found to be essential to Whiting's reorganization effort. *In re Whiting Pools, Inc.,* 10 B.R. 755 (Bankr.W.D.N.Y. 1981). Accordingly, the bankruptcy court ordered the IRS to turn over the property on the condition that Whiting provide the IRS with specified protection for its interest. *Whiting Pools,* 10 B.R. at 760–61. The IRS appealed, challenging the bankruptcy court's authority to order turnover under either § 542(a) or § 543(b)(1); however, the court of appeals affirmed. Seeking reversal of the court of appeals' conclusion, the IRS argued that its prepetition seizure by tax levy removed the property from inclusion in the debtor's reorganization efforts. The Supreme Court rejected the IRS's position and held that § 542(a) required a secured creditor in possession of the debtor's property seized prepetition to turn over that property to the trustee if the trustee is authorized to use, sell or lease the property under § 363. *Whiting Pools,* 462 U.S. at 203–207, 103 S.Ct. at 2312–2315. Concluding that "§ 542 grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings", the Supreme Court stated that "§ 542 modifies the procedural rights available to creditors to protect and satisfy their liens." *Whiting Pools,* 462 U.S. at 206–207, 103 S.Ct. at 2314 (footnotes and citations omitted).

The majority line of cases, including *Knaus, Abrams* and their followers, focus on the Supreme Court's conclusion in *Whiting*

---

**10.** The Supreme Court's recent decision in *Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) is consistent with *Whiting Pools* in that the creditor made no attempt to exercise control over property of the estate without filing a motion for relief from the stay.

*Pools* that § 542(a) grants the estate a possessory interest in property of the debtor which was not in the debtor's physical possession when the bankruptcy petition was filed. These courts note the Supreme Court's recognition that § 542(a) modifies the creditor's procedural rights and cite this holding as support for the proposition that a creditor's failure to return property seized prepetition upon the debtor's postpetition request is sanctionable as a violation of § 362(a)(3). The majority line of cases maintains that the failure to return estate property after receiving notice of a bankruptcy constitutes a willful violation of the automatic stay and frequently reasons that:

> Otherwise, if persons who could make no substantial adverse claim to a debtor's property in their possession could, without cost to themselves, compel the debtor or his trustee to bring suit as a prerequisite to returning the property, the powers of a bankruptcy court and its officers to collect the estate for the benefit of creditors would be vastly reduced. The general creditors, for whose benefit the return of the property is sought, would have needlessly to bear the cost of its return.

*Knaus,* 889 F.2d at 775 (citations omitted).

In the same vein, the courts which adhere to the majority position agree that the duty to cause the postpetition return of property of the estate is not on the debtor, but rather the party who exercises control over the property of the estate. Although a trustee or debtor-in-possession does have the ability to bring a motion to compel turnover under § 542, these courts hold that the case law and legislative history of § 362 indicate that Congress did not intend to place the burden on the bankruptcy estate to absorb the expense of potentially multiple turnover actions. Courts adopting the majority position commonly conclude that § 542 provides the right to the return of estate property, while § 362(h) provides the remedy for the failure to do so. The *Abrams* court stated that "[s]upport for this right/remedy concept is also found in the fact that the Code expresses no remedy for a violation of § 542, while § 362 contains its own remedial provision." *Abrams,* 127 B.R. at 243.

The continued existence of the majority position was recently documented in *General Motors Acceptance Corp. v. Ryan (In re Ryan),* 183 B.R. 288 (M.D.Fla.1995), a case factually similar to the case at bar. There, General Motors Acceptance Corp. ("GMAC") repossessed an automobile when the purchaser failed to remit installment payments due under the financing contract and removed the car from the state without notifying GMAC. Pursuant to the financing contract, GMAC declared the entire balance due and payable and refused the purchaser's offer to tender payment of the installments due. Less than a week after the repossession, the purchaser filed a chapter 13 petition and provided notice to GMAC. Although notified of the debtor's filing, GMAC advised the attorney for the debtor that a turnover action pursuant to § 542 would have to be instituted in order to secure the return of the automobile. The debtor filed a turnover action and GMAC moved for relief from stay. The bankruptcy court ordered turnover with protection to GMAC and the automobile was returned, but the debtor then filed a motion for sanctions pursuant to § 362(h). The bankruptcy court found GMAC liable for the costs the debtor incurred to rent a replacement automobile the week of the repossession. GMAC appealed the court's order. The district court affirmed the bankruptcy court's finding that GMAC violated the stay, but remanded the case to the bankruptcy court for further proof on the issue of damages. In reaching its conclusion, the *Ryan* court recognized that a creditor's duty to turn over property of the estate arises upon the filing of the bankruptcy petition. The *Ryan* court stated:

> A creditor's failure to voluntarily turn over property taken lawfully prepetition, when so requested by the debtor postpetition, is a violation of the automatic stay. This means that instead of waiting for the debtor to institute turnover proceedings, the creditor should come into court upon proper notification, and request a lifting of the automatic stay, at which time the creditor may obtain the protection to which it is entitled.

*Ryan,* 183 B.R. at 289.

On the other hand, a minority line of cases relies on *Whiting Pools* as authority for the

contention that the provision of adequate protection of a secured creditor's interest is a prerequisite to turnover. These "adequate protection" courts emphasize the fact that the *Whiting Pools* court did not expressly state whether the secured creditor must immediately turn over the property, or may hold it until the question of adequate protection pursuant to § 363 is resolved, and focus on the Supreme Court's acknowledgment that "[t]he Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession." *Whiting Pools,* 462 U.S. at 207, 103 S.Ct. at 2315. Stated differently, the "adequate protection" courts note that the *Whiting Pools* court did not specify whether § 542 was self-executing, and urge against a construction which would produce that result.

Some courts which adhere to the "adequate protection" position have attempted to distinguish the contrary authority in *Knaus* based on the Eighth Circuit's failure to address the language in *Whiting Pools* which indicates that adequate protection of a secured creditor's interest is a prerequisite to turnover. See *In re Najafi,* 154 B.R. at 194 and *In re Richardson,* 135 B.R. at 260. Emphasis is placed on the Supreme Court's awareness that at the bankruptcy court level, the IRS was directed to "turn the property over to Whiting *on the condition* that Whiting provide the Service with specified protection for its interests" and that Whiting was to pay the Service $20,000 *before* the turnover occurred. *Young,* 193 B.R. at 622, citing *Whiting Pools,* 462 U.S. at 201, 103 S.Ct. at 2311 (emphasis provided).

This court suggests that the analysis of *Whiting Pools* employed by the majority line of cases is appropriate in connection with automatic stay and adequate protection issues and consistent with this court's interpretation of § 362(a)(3). It should be noted that *Whiting Pools* involved a § 542 turnover analysis, and not a § 362 automatic stay analysis and the Court did not hold that a secured creditor's determination of adequate protection is a prerequisite to turnover.

A critical fact in *Whiting Pools* is that the IRS moved for relief from stay *before* the debtor moved for turnover pursuant to § 542. Any prerequisite to turnover was determined by the *bankruptcy court,* not the creditor, and only *after* the court made a determination that the seized property was property of the estate and refused to lift the stay. Had the IRS not sought a court determination of its rights, but instead insisted on its determination of adequate protection from Whiting as a prerequisite to turnover, such a course of action would have violated the automatic stay. Instead of making a unilateral determination, the IRS immediately filed a motion asking the court to determine whether the seized property was property of the estate, and if it was, requesting appropriate relief.

The determinative distinction between the factual scenario in *Whiting Pools* and the factual scenario presently before this court cannot be overemphasized. In the case before this court, the creditor (TranSouth) made its own determination that either the stay did not apply to it or that it, not the court, would determine adequate protection. The former scenario, employed by the IRS in *Whiting,* is contemplated by the structure of the Code. The latter scenario, employed by TranSouth, violates the provisions of the Code and its policy of preventing any creditor from becoming a self-determining arbiter of what constitutes property of the estate and what actions are permitted or prohibited by the stay. See *Matter of Hughes–Bechtol, Inc.,* 117 B.R. 890, 905 (Bankr.S.D.Ohio 1990), citing *In re Smith,* 876 F.2d 524, 525–26 (6th Cir.1989) and *Matter of Brock,* 58 B.R. 797, 804 (Bankr.S.D.Ohio 1986). This court finds that TranSouth willfully violated the automatic stay.

At this juncture, it is appropriate for the court to determine TranSouth's Motion for Relief from Stay or Adequate Protection, which was filed subsequent to the Debtor's Motion for Contempt and Sanctions for Violation of the Automatic Stay. In support of its request for relief, TranSouth makes two (2) arguments. TranSouth contends that it lacks adequate protection of its interest and the stay should be lifted "for cause" pursuant to § 362(d)(1). Secondly, TranSouth alleges that the Debtor has no equity in the Vehicle

and it is not necessary for an effective reorganization pursuant to § 362(d)(2) [11]. In the event that this court declines to order relief from stay, TranSouth alternatively requests that the Debtor be required to provide adequate protection payments and proof of insurance pursuant to § 362(e). This court finds that there is no cause to grant TranSouth relief from stay pursuant to § 362(d)(1). (See section C, titled Confirmation).

With respect to TranSouth's request for relief under § 362(d)(2), the Code provides that the party requesting such relief has the burden of proof on the issue of the debtor's equity in the property and the debtor has the burden to establish that the property is necessary for an effective reorganization. 11 U.S.C. § 362(g). Inasmuch as the Vehicle, valued at $27,737.50 (See section B, titled Valuation), secures TranSouth's claim exceeding $37,000, the Debtor has no equity in the Vehicle. The second requirement of § 362(d)(2), that the property be "necessary to an effective reorganization", was construed by the Supreme Court in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) as requiring that the property be essential for an effective reorganization that is in prospect. In other words, an "effective reorganization" requires a showing of a reasonable prospect for a successful reorganization within a reasonable time. This court has concluded that the Debtor met all of the requirements of § 1325 as part of the determination of confirmation. (See section C, titled Confirmation). The Vehicle is the Debtor's only means of transportation to and from her employment, which is the source for funding her plan. TranSouth offered no evidence to establish or suggest that the Vehicle is "a luxury vehicle beyond the contemplation of the Code." In the circumstances of this case, including the

Debtor's need for reliable transportation, monthly income and expenses, total assets and liabilities, and success in obtaining confirmation, TranSouth's motion for relief from stay pursuant to § 362(d)(2) is denied.

An undersecured creditor may be entitled to adequate protection to ensure against the decline in value of its collateral, *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. at 370, 108 S.Ct. at 630, but it is only required when a creditor affirmatively asserts its right to receive it. *In re Coates,* 180 B.R. 110 (Bankr.D.S.C.1995); *In re Hinckley,* 40 B.R. 679 (Bankr.D.Utah 1984). Consistent with § 1325(a)(5)(B), TranSouth's interest in the Vehicle is adequately protected by the proposed plan payments. The proposed plan provides for monthly payments of the agreed value of TranSouth's secured claim at the agreed interest rate. Neither the valuation, nor the interest rate were contested by TranSouth at the time the court held the valuation and confirmation hearings. The Debtor is current on her monthly payments and has maintained insurance on the Vehicle since the inception of this case. The Debtor has satisfied her burden of providing adequate protection.

### B. VALUATION

Under § 1325(a)(5)(B)(2), a creditor is entitled to receive the present value of its allowed secured claim. The amount of such secured claim is determined by § 506(a). Numerous courts have published decisions on the issue of the proper method of valuing an undersecured creditor's allowed secured claim for purposes of § 506(a). In general, the courts which have addressed this issue have adopted one of three methods of valuation: valuation at retail value, (see *In re Rash,* 31 F.3d 325 (5th Cir.1994), *reh'g grant-*

---

11. 11 U.S.C. § 362(d) provides, in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization;

ed en banc 68 F.3d 113 (5th Cir.1995)); valuation at wholesale value, (see *In re Mitchell,* 954 F.2d 557 (9th Cir.), *cert. denied* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992)); or valuation at the average between wholesale and retail values.

By local rule, this court has adopted the third method, the average between the wholesale and retail values. This method reflects general market conditions for a vehicle, which is conceded to be subject to continual depreciation, whether it is in the possession of the debtor or the creditor. Other courts which have given consideration to the appropriate standards for resolving disputed valuation of a vehicle to be retained by a debtor under the terms of the plan have adopted the same standards. See *In re Maddox,* 194 B.R. 762 (Bankr.D.N.J.1996); *In re Madison,* 186 B.R. 182 (Bankr.E.D.Pa. 1995); *In re Hoskins,* 183 B.R. 166 (Bankr. S.D.Ind.1995); *In re Myers,* 178 B.R. 518 (Bankr.W.D.Okla.1995); *In re Rowland,* 166 B.R. 172 (Bankr.N.D.Fla.1994); *In re Stauffer,* 141 B.R. 612 (Bankr.N.D.Ohio 1992).

Pursuant to the Local Rules of the United States Bankruptcy Court for the Southern District of Ohio, which authorize the court in Dayton to promulgate such rules for the governing of chapter 13 proceedings as it may deem appropriate, the Local Bankruptcy Rules Dayton—chapter 13 were adopted and became effective January 1, 1991. A copy of selected chapter 13 rules, including Rule D–3.18.3(g), is attached to the Notice of Commencement of Case Under Chapter 13 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates, which is mailed to all creditors by the chapter 13 trustee. Rule D–3.18.3(g) provides:

> Unless otherwise determined by the court, the general standard for resolving disputed valuation of motor vehicles shall be the average of the trade-in value and the retail value, including options, contained in the Central Edition of N.A.D.A. Official Used Car Guide for the month the debtor's petition was filed, or the most recent National Edition of the Appraisal Guides for Older Cars, for Older R.V.s, and Older Motorcycles. If the parties have complied with the above procedures [D–3.18.3(c) and (d)],

any party may present otherwise admissible evidence regarding the value of the collateral.

In open court, counsel for TranSouth and counsel for the Debtor agreed, pursuant to the local rule set forth above, that the secured claim in the Vehicle would be valued at the average of NADA wholesale and NADA retail values on the petition date. Neither party exercised their option to present otherwise admissible evidence of factors necessitating a higher or lower value of the collateral. Counsel for the parties jointly calculated the average of the NADA wholesale and retail value on the petition date, plus options, to fix the amount of TranSouth's secured claim in the Vehicle at $24,737.50. The confirmation order will provide that TranSouth be paid this amount over time through the plan administered by the chapter 13 trustee. The court notes that the chapter 13 trustee will begin distributing funds from the Debtor's accumulated payments the month following the entry of the confirmation order and will, thereafter, continue monthly distributions pursuant to the terms of the confirmed plan.

■■■ With respect to the Service Contract, this court concludes that it is not an executory contract which the Debtor must assume or reject pursuant to § 365. The Service Contract requires no future performance by the Debtor, except to make payments under the Agreement, which will now be paid pursuant to the confirmed plan. Since the language of the Agreement did not grant TranSouth a security interest in the Service Contract itself, the court also concludes that the value of the Service Contract should not be included in TranSouth's allowed secured claim. See *In re Mitchell,* 954 F.2d 557 (9th Cir.1992); *In re Loos,* 189 B.R. 495 (Bankr.D.Ariz.1995); *In re Dews,* 191 B.R. 86 (Bankr.E.D.Va.1995).

## C. CONFIRMATION

■■ In the Sixth Circuit, the analysis required for a determination of a debtor's "good faith" when filing for relief under

chapter 13 pursuant to § 1325(a)(3) [12] was initially discussed in *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982). There, the Sixth circuit stated that bankruptcy courts "should not allow a debtor to obtain money, services, or products from a seller by larceny, fraud or other forms of dishonesty and then keep his gain by filing a Chapter 13 petition within a few days of the wrong". *Memphis Bank*, 692 F.2d at 432. When the debtor's conduct is dishonest, the *Memphis Bank* court stated that the plan simply should not be confirmed. *Memphis Bank*, 692 F.2d at 432. When the debtor's conduct is "questionable but is not shown to be dishonest", the *Memphis Bank* court wrote that the bankruptcy court can require full payment in accordance with the contract. *Memphis Bank*, 692 F.2d at 432.

■ To avoid a rigid interpretation of the *Memphis Bank* decision which would automatically require 100% repayment of a debt any time "questionable" (not purely dishonest) pre-plan conduct is found, the Sixth Circuit subsequently clarified its position in *In re Okoreeh–Baah*, 836 F.2d 1030 (6th Cir. 1988). The *Okoreeh–Baah* court stated that the circuit "did not mean to adopt a rule requiring 100% payment *any* time 'questionable pre-plan conduct' exists, without analyzing any of the debtor's other circumstances." *Okoreeh–Baah*, 836 F.2d at 1032 (emphasis in original). Concluding that *Memphis Bank* did not establish a *per se* rule, but was merely offering a possible avenue of recourse for courts dealing with debtors who have engaged in "questionable pre-plan conduct", the *Okoreeh–Baah* court adopted a "totality of the circumstances" standard which employs a fact-specific analysis and requires the use of discretion by the bankruptcy judge. Critical to the "good faith" determination is whether there is "a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources". *Okoreeh–Baah*, 836 F.2d at 1033. *Okoreeh–Baah* indicates that there are at least twelve pre- and post- petition factors which a bankruptcy

judge should weigh in making a good faith determination. *Okoreeh–Baah*, 836 F.2d at 1032 fn. 3 (citing *Matter of Kull*, 12 B.R. 654 (S.D.Ga.1981), *aff'd sub nom. In re Kitchens*, 702 F.2d 885 (11th Cir.1983)). See also *In re Doersam*, 849 F.2d 237, 239 (6th Cir.1988) (listing eleven factors). This court recognizes that the factors identified by the Eleventh Circuit in *Kitchens* do not constitute an exhaustive list, but merely serve as guidelines for a "good faith" determination. As acknowledged by the bankruptcy court in *In re Mitchell*, 191 B.R. 957, 960–61 (Bankr. M.D.Ga.1995), close proximity in time between a debtor's purchase of collateral and the filing of a chapter 13 petition may evidence lack of good faith; however, the *Mitchell* court noted that an unanticipated change in circumstances can mitigate an apparent lack of good faith.

Examining the factors listed in *Okoreeh–Baah* and applying the standards adopted by the Sixth Circuit to the facts of this case, this court finds that the Debtor's plan meets the good faith requirement of § 1325(a)(3). The Debtor and her dependent children have a monthly income of $3,420, monthly expenses of $2,420, and propose to commit the difference, $1,000, for sixty (60) monthly payments. There has been no objection to the accuracy of the Debtor's schedules, income, or expenses, and the plan provides that the entire surplus is to be paid to the chapter 13 trustee. The Debtor's uncontroverted testimony established that she is self-employed in the cleaning/janitorial business. For approximately two (2) years, the Debtor's business has contracted with a local university and has been solely devoted to cleaning the buildings on the university campus. The uncontroverted testimony also established that the Debtor anticipates receiving increased income from the university and that the contract is to extend into the foreseeable future. The amount of attorney fees to be awarded in the case and paid by the Debtor is reasonable. Although not required by the Code, the

---

**12.** 11 U.S.C. § 1325(a)(3) provides:

"(a) The court shall confirm a plan if—

. . . . .

(3) the plan has been proposed in good faith and not by any means forbidden by law ..."

Debtor has proposed a sixty (60) month plan, the maximum duration a plan can extend under the provisions of the Code. The court finds that the Debtor established cause for the plan to extend for the entire sixty (60) months. The Debtor's modification of the claims of all secured creditors is consistent with the provisions of the Code and the Debtor has not alerted the court to any special circumstances such as inordinate medical expenses.

Although the Debtor and her former spouse filed a chapter 7 case in 1992, the changes in the Debtor's circumstances, including her divorce, her self-employment in a janitorial business, and the unanticipated repossession of her only vehicle, justify her present filing. The court finds that the prior filing is not indicative of bad faith in the Debtor's present filing. Counsel for the chapter 13 trustee indicated that the Debtor is current in her plan payments and is not proposing a plan which would place an administrative burden upon the trustee.

In addition to the statutorily mandated policy that bankruptcy provisions be construed liberally in favor of the Debtor, the criteria which remain for consideration are the circumstances under which the debt was incurred, the Debtor's sincerity in seeking chapter 13 relief, and the amount of payment offered by the Debtor as indicative of the Debtor's sincerity to repay the debt. The overlap between these criteria is readily apparent, allowing the court to discuss them in unison.

In assessing the circumstances under which the debt was incurred, it is important to recall that a substantial down payment ($3,450) was made by the Debtor in connection with the purchase of the Vehicle. The Debtor has enjoyed continuous employment and has no reason to anticipate a change in employment status or a decrease in income. Although the Debtor defaulted under the terms of the Agreement when the check for the February 1996 payment was not honored, the default is mitigated by the fact that it was occasioned by the Debtor's change of financial institutions. The Debtor took immediate steps to rectify the situation by explaining what transpired to a TranSouth representative and offering to cure the default. To avoid repossession of the Vehicle, the Debtor was informed that it would be necessary to simultaneously remit payment for the months of February and March 1996. Although the Debtor complied with TranSouth's demand and tendered a check for two (2) payments, TranSouth repossessed the Vehicle. The Debtor suddenly faced the loss of the Vehicle, which was necessary to her continued employment, the loss of her prior payments, the possibility of a deficiency judgment, and actions by TranSouth which were the opposite of the creditor's representations.

The Debtor's uncontradicted, credible testimony was that she had no knowledge of chapter 13 proceedings and had not contacted an attorney prior to purchasing the Vehicle. In fact, the Debtor did not contemplate bankruptcy until she contacted an attorney for advice on how to secure the return of the Vehicle. The court finds credible the Debtor's testimony that she would not have considered filing chapter 13 had TranSouth not repossessed the Vehicle after she tendered the $2,000 payment TranSouth demanded. Having examined the totality of the circumstances, this court concludes that the Debtor filed this case and proposed her chapter 13 plan in good faith. The Debtor was not guilty of questionable prepetition misconduct in purchasing the Vehicle, attempting to make her payments as requested by TranSouth, seeking legal advice, or exercising a congressionally permissible choice concerning the filing of a chapter 13 case. The Court concludes the Debtor sincerely intends repayment of her prepetition debt consistent with her available resources.

This court recognizes that at least one other bankruptcy court has reached a different conclusion on facts similar to those presently under consideration. See Brief of TranSouth Financial Corporation in Support of Opinion Rendered in *In re Barnes* (Doc. 39–1). In *In re Barnes*, 191 B.R. 963 (Bankr. M.D.Ga.1996) a debtor proposed to retain a 1989 Pontiac purchased one hundred five (105) days before the chapter 13 petition was filed. In connection with the purchase of the vehicle in *Barnes,* the debtor signed an in-

stallment sales contract which provided for the purchase price of $6,080.45 to be paid with 28% interest. The debtor's plan proposed to pay the creditor $4,000 plus 12% interest on its secured claim, and classify the balance as an unsecured claim, scheduled to receive no payments. The *Barnes* court acknowledged that the repayment terms and interest rate in the proposed plan were comparable to numerous other plans it routinely approved, but noted that the filing of the case created an "irreparable harm [to the creditor] which occurred nearly immediately after the Debtor took possession of the vehicle". *Barnes*, 191 B.R. at 965. Even though the *Barnes* court found that the debtor "did not incur the debt with a view towards filing chapter 13", "dedicated all her disposable income to fund the plan", and that the proposed plan "may comply with all the provisions of the Bankruptcy Code", it decided the debtor's plan could not be confirmed. *Barnes*, 191 B.R. at 965. Concluding that confirmation of the debtor's plan would create a virtual windfall for the debtor by allowing her to reduce her contractual obligation but retain all of the benefits of that contract, the *Barnes* court stated that "[s]uch a benefit and its corresponding detriment occurring so soon after the transaction was undertaken is simply unfair and unsuitable to the equitable environment in which cases in this court must exist." *Barnes*, 191 B.R. at 965. Accordingly, the *Barnes* court gave the debtor the option of paying the creditor's claim in full, *but at a reduced interest rate*, or returning the vehicle in full satisfaction of the claim.

This court notes several distinctions between this case and the *Barnes* case. The court in this case has concluded the Debtor established cause for her plan to extend for the maximum length allowed by the Code (60 months), while the debtor in *Barnes* proposed a plan for only 36 months.[13] The anticipated distribution to allowed unsecured creditors in this case is twenty-four percent (24%) (which could increase pursuant to the pot plan provisions) compared to the proposed distribution in *Barnes* of zero percent (0%). Relatively prompt distributions to creditors are proposed in this case, as opposed to a concern about "delay" which inclined the *Barnes* court "to grant relief to this creditor on terms that might be more favorable than other creditors could expect in similar cases." *Barnes*, 191 B.R. at 966, footnote 1. These distinctions may or may not satisfactorily explain the different results reached in cases which share a similar fact pattern.[14]

This court suggests that an appropriate analysis is aided by examining the provisions of chapter 13 which govern the treatment of an allowed claim secured by a vehicle.[15] Specifically applicable to this issue is § 1325(a)(5)(B), pursuant to which TranSouth will retain its lien and receive the allowed agreed amount of its secured claim plus an agreed interest rate. (See section B, titled Valuation).

**13.** 11 U.S.C. § 1322(d) provides:

The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years.

**14.** The court notes that although TranSouth, understandably, cited *In re Barnes*, 191 B.R. 963, decided by the Middle District of Georgia, Macon Division, on January 31, 1996, there is no citation to *In re Mitchell*, 191 B.R. 957, decided by the Middle District of Georgia, Columbus Division, on November 14, 1995. *Mitchell*'s facts involve chapter 13 debtors who purchased a vehicle 134 days prior to filing and made only two (2) payments pursuant to the contract. The debtors proposed a plan which reduced the purchase price and contract interest rate in accordance with the provisions of § 1325(a)(5) and proposed zero percent (0%) to unsecured creditors. The

*Mitchell* court did "[n]ot find that debtors acted in bad faith in proposing their chapter 13 plan" and confirmed the plan as proposed.

**15.** 11 U.S.C. § 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder;

Although Congress has demonstrated its willingness to provide protection to particular classes of creditors through the express provisions of the Code, there are no provisions which protect creditors whose claims are secured by a security interest in a vehicle purchased by an individual who files a chapter 13 case several months thereafter. Section 1322(b)(2) which provides that a chapter 13 debtor cannot modify the rights of a creditor whose claim is secured only by a security interest in real property that is the debtor's principal residence demonstrates Congress' ability to provide express statutory protection for particular classes of creditors. Similarly, § 1322(a)(2) requires full payment of claims entitled to priority under § 507, including claims for debts for alimony, maintenance or support. 11 U.S.C. § 507(a)(7). Congress has also enacted legislation that treats certain debts incurred in a specified time period prior to filing bankruptcy in a different manner than other debts incurred in that same prefiling time period.[16] Conspicuously absent from claims given protection from modification, requiring full payment, or recognized for different treatment based on a debtor's actions in a several month period prior to filing, are claims secured by a security interest in a vehicle, even if the vehicle was purchased a short time prior to filing chapter 13. The absence of express statutory protection for claims of the type held by TranSouth supports the conclusion that Congress did not intend to afford protection from modification to such claims.

This court recognizes the significant body of case law concerning good faith pursuant to § 1325(a)(3) discussed previously; however, it is important to recall that in this case and in *Barnes*, neither court concluded that the chapter 13 debtor proposed the plan in bad faith. In light of the language and structure of applicable chapter 13 provisions and, in the absence of a finding that the debtor's plan was proposed in bad faith, this court declines to do indirectly what Congress declined to do directly. Although these cases require a fact specific analysis, this court is unable to create a judicial category that would prevent a Debtor from exercising a congressionally authorized option available to deal with a debt secured by a recently purchased vehicle. The Debtor's plan will be confirmed.

## D. BURDEN OF PROOF

■ As the party moving for damages for violation of the automatic stay pursuant to § 362(h), the court holds that the Debtor bears the burden of proof by the preponderance of the evidence. Unless "particularly important individual rights or interests are at stake", the United States Supreme Court presumes the preponderance of the evidence standard is applicable in civil actions between private litigants because this standard results in a roughly equal allocation of the risk of error between litigants. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (citations omitted). Bankruptcy courts have consistently recognized the applicability of the preponderance of the evidence standard in cases in which the debtor alleges an automatic stay violation. See *In re Meis–Nachtrab*, 190 B.R. 302 (Bankr.N.D.Ohio 1995); *Gordon v. Dennis Burlin Sales, Inc.*, 174 B.R. 257 (Bankr.N.D.Ohio 1994); *In re Estep*, 173 B.R. 126 (Bankr.N.D.Ohio 1994).

■ Contempt proceedings are distinguishable from actions for damages brought pursuant to § 362(h), and a different burden of proof applies. In order for a party to be held in civil contempt, a court must find that the party violated a specific and definite court order and that the party had knowledge of the order sufficient to put such party on notice of the proscribed conduct. *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). The moving party in an action for

---

**16.** 11 U.S.C. § 523(a)(2)(C) provides, in relevant part:

(C) ... consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable ...

civil contempt must prove his case by clear and convincing evidence. *In re Mack,* 46 B.R. 652 (Bankr.E.D.Pa.1985). Upon a finding of civil contempt, a court may impose a fine or *in terrorem* damages in order to coerce compliance with its orders and may also award damages to compensate the aggrieved party for any actual loss suffered, including attorney's fees and costs. *In re Wagner,* 74 B.R. at 902 citing *Matter of Depoy,* 29 B.R. 466 (Bankr.E.D.Pa.1983).

Civil contempt is the remedy which was ordinarily invoked by parties aggrieved by a violation of the automatic stay prior to the enactment of § 362(h). See Kennedy, *The Automatic Stay in Bankruptcy,* 11 U.Mich.J.L.Reform 177, 259–66 (1977). Section 362(h) was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353 and provides for recovery of actual damages, attorneys' fees, costs and, where appropriate, punitive damages, for a "willful" violation of the automatic stay. Although the precise reason for the enactment of subsection (h) is not clear (See Collier on Bankruptcy ¶ 362.12, at 362–90 (15th ed. 1987)) ("Collier"), it appears that it was meant to supplement, not replace, the civil contempt remedy. See 130 Cong.Rec. H1942 (daily ed. March 26, 1984) (remarks of Rep. Rodino) (section 362(h) "is an additional right of individual debtors, and is not intended to foreclose recovery under already existing remedies"); 2 Collier ¶ 362.13, at 362–90 (suggesting that while recovery of damages, counsel fees and costs may be discretionary in a contempt proceeding, such relief is mandatory under section 362(h)). Against this background, it is appropriate to conclude that the debtor bears the burden of proof by a preponderance of the evidence in an action for damages brought pursuant to § 362(h) and that the clear and convincing standard only applies in civil contempt proceedings.

TranSouth relies upon *In re Bennett,* 135 B.R. 72 (Bankr.S.D.Ohio 1992) for the proposition that the Debtor must prove a violation of the stay by clear and convincing evidence, but this reliance is misplaced. Although *In re Bennett* does state that "[t]he moving party bears the burden of proof in an action for violation of the stay and must prove his case by clear and convincing evidence", the cases cited by the *Bennett* court as support for the quoted statement were civil contempt proceedings. Specifically, the *Bennett* court relied upon *Brockington v. Citizens and Southern Nat'l Bank of South Carolina (In re Brockington),* 129 B.R. 68, 70 (Bankr. D.S.C.1991), *In re Zunich,* 88 B.R. 721 (Bankr.W.D.Pa.1988), and *In re Wagner,* 74 B.R. 898 (Bankr.E.D.Pa.1987), each of which involved civil contempt proceedings. The *Bennett* court would have correctly applied the clear and convincing burden of proof standard in a civil contempt proceeding, but the applicable burden of proof in a stay violation damage proceedings is a preponderance of the evidence.

### E. DAMAGES

An individual injured by a willful violation of the automatic stay is entitled to recover actual damages, including costs and attorney fees, and, in appropriate circumstances, punitive damages. 11 U.S.C. § 362(h). In construing the provisions of § 362(h), courts have held that a "willful violation" does not require a specific intent to violate the automatic stay. *In re Atlantic Business & Community Corp.,* 901 F.2d 325, 329 (3d Cir.1990); *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989). Rather, § 362(h) provides for damages upon a finding that the party knew of the automatic stay and that the party's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to property is not relevant to whether the act was "willful" or whether compensation must be awarded. *Bloom,* 875 F.2d at 227 (citations omitted).

A specific purpose of the automatic stay is to allow a debtor in the initial period of a reorganization case to focus on plan preparation, filing, and execution, free from the burden of responding to any creditor activity not authorized by the Code. The specific language of § 362(h) augments the court's authority to protect the debtor and the estate from being diminished by the amount of loss any unauthorized creditor activity causes the debtor or the estate. Such

a loss would include the payment of attorney fees incurred by the debtor, which if not paid by the party who violated the stay, would diminish funds otherwise entitled to distribution through the estate or available as exempt property to the debtor. The choice of the mandatory word "shall" in § 362(h) and the purposes underlying the automatic stay compel the conclusion that an award against TranSouth is appropriate for its willful violation of the automatic stay.

The amount of the award is subject to several factors. The issue of attorney fee awards pursuant to § 362(h) was analyzed in *In re McLaughlin*, 96 B.R. 554 (Bankr. E.D.Pa.1989), where the court observed that "rewarding debtors too lavishly in § 362(h) actions will encourage a cottage industry of precipitous § 362(h) litigation", but also recognized that "counsel for a debtor who is jeopardized in any significant manner by a stay violation and reasonably resorts to court to remedy the violation, should recover at least some measure of damages." *McLaughlin*, 96 B.R. at 560–562. See also *In re Smith*, 170 B.R. 111, 117 (Bankr.N.D.Ohio 1994) ($1,235 attorney fee award); *In re Herbst*, 167 B.R. 983 (Bankr.N.D.Fla.1994) ($1,767.75 attorney fee award); *In re Bush*, 166 B.R. 69 (Bankr.W.D.Va.1994) ($1,500 attorney fee award). But see *In re Belcher*, 189 B.R. 16 (Bankr.S.D.Fla.1995) ($20 attorney fee award).

In this case the court finds that the attorney for the Debtor initiated contact with TranSouth's representatives and counsel and provided them with the Debtor's bankruptcy case number, copies of the Debtor's schedules, and proof of insurance coverage. TranSouth's representatives and counsel were contacted on multiple occasions, during normal business hours, when TranSouth could have simply authorized the release of the Vehicle to the Debtor. Counsel for the Debtor attempted to "educate the creditor of the bankruptcy filing and its effects", *McLaughlin*, 96 B.R. at 560, and attempted to "encourage the offending creditor to desist". *McLaughlin*, 96 B.R. at 561. All to no avail. Despite TranSouth's apparent awareness of *In re Sutton*, 87 B.R. 46 (Bankr.S.D.Ohio 1988) requiring the return of the Vehicle (see

footnote 3), TranSouth caused the Debtor to resort to this court to remedy the stay violation. TranSouth's violation of the stay significantly jeopardized both the Debtor's personal transportation, and her income from her self employment as the operator of a cleaning service.

Reviewing counsel for the Debtor's time records listed on attached Exhibit A pursuant to the lodestar principles of *In re Boddy*, 950 F.2d 334 (6th Cir.1991) and 11 U.S.C. § 330, the court determines that all the services listed were reasonable, necessary, and beneficial. The court notes that the time entries of March 11, 1996 and March 12, 1996 detail attempts to obtain TranSouth's compliance with the Code's requirements. If TranSouth had returned the Vehicle at that time, this court would generally not award attorney fees and would consider such services to be a component of counsel for the Debtor's ordinary fee award in a chapter 13 case. However, in the circumstances of this case, the multiple creditor caused contacts unreasonably increased counsel for the Debtor's efforts and require that these attorney fees be assessed against TranSouth.

The court determines that all of the other time entries listed on attached Exhibit A were sufficiently detailed, caused by TranSouth's failure to comply with the Code's requirements, and directly related to remedying the stay violation. Accordingly, the time entries are allowed as filed. By the court's calculation, counsel for the Debtor expended 14.15 hours.

The remaining factor is the reasonableness of the hourly rate charged by counsel for the Debtor. For the reasons previously noted, including the absence of any objection to the claimed rate in this stay litigation, the court determines the requested rate of $150.00 per hour is reasonable. Accordingly, the calculation of 14.15 hours at $150 per hour results in an award of $2,122.50, for which judgment will be entered in favor of the Debtor against TranSouth with interest to run pursuant to 28 U.S.C. § 1961 from the date of judgment until paid.

The court further determines that the facts of this case do not present the appropriate circumstances to award punitive damages.

This determination is based upon an expectation that TranSouth will not repeat its actions in future proceedings before this court. If the court's expectation is incorrect, the court would consider a different determination regarding an award of punitive damages.

Orders in accordance with this decision are contemporaneously entered.

**SO ORDERED.**

## EXHIBIT A

ROSEMARY SHARON
CHAPTER 13 BANKRUPTCY CASE NO. 96–31035
TIME LOG–RE STAY VIOLATION ONLY

| | | |
|---|---|---|
| 03/11/96 | Phone call to TranSouth Financial Corporation, Ft. Worth, Texas, Davey Havenor RE advising of filing of Chapter 13 & request return of car | ¼ hr |
| 03/11/96 | Phone call to TranSouth, Ed Rogers, Customer Service Rep. RE advising of filing of Chapter 13 & request return of car | ¼ hr |
| 03/11/96 | Phone call to client RE checking status of car | 10 mn |
| 03/11/96 | Phone call to TranSouth, Davey Havenor RE now requesting copy of schedule & verification of insurance | ¼ hr |
| 03/11/96 | Phone call to client RE insurance & advise to fax copy of declaration & agent directly to TranSouth | ¼ hr |
| 03/11/96 | Follow up phone call to TranSouth, Davey Havenor RE make sure received verification of insurance & request return of car | ¼ hr |
| 03/11/96 | Phone call from client RE checking status of car | 5 mn |
| 03/11/96 | Phone call to Wade Holliday, Atty for TranSouth, Dallas, Texas RE left message | 5 mn |
| 03/12/96 | Phone call to Atty Wade Holliday RE return of car & faxed copy of schedule | ¼ hr |
| 03/12/96 | Follow up phone call to Atty Holliday RE to see if TranSouth will return car | 10 mn |
| 03/12/96 | Phone call from client RE inquiring status of car | 10 mn |
| 03/14/96 | Legal research RE stay violation for refusal to return car | 1 hr |
| 03/14/96 | Preparation of Motion for Contempt & Motion for Expedited Hearing | 1 hr |
| 03/14/96 | Faxed copies of Motion for Contempt & Expedited Hearing to Davey Havenor with correspondence advising to contact HJ in event of change of position | ¼ hr |
| 03/20/96 | Receipt & review of correspondence & Motion for Relief as filed by TranSouth from Atty Phyllis Ulrich (time spent includes follow up phone call to Atty Ulrich requesting release of car) | ½ hr |
| 03/20/96 | Phone call to client in preparation for hearing | ½ hr |
| 03/21/96 | Attendance at hearing on Motion for Contempt | 1 hr |
| 03/21/96 | Personal trip to Court to file Motion for Contempt & Request for Expedited Hearing | ½ hr |
| 03/21/96 | Preparation & filing of certificate of service pursuant to Court Order | ½ hr |
| 03/22/96 | Phone call from client RE advising TranSouth refusal to turn over car, despite Court Order | ¼ hr |
| 03/22/96 | Phone call to Atty Steve Miles | ¼ hr |
| 03/22/96 | Phone call to Atty Ulrich RE left message | 5 mn |
| 03/22/96 | Phone call from client requesting status | 5 mn |
| 03/22/96 | Phone call from Atty Steve Miles RE advising he will check to see reason for denial of turn over of car | 10 mn |
| 03/22/96 | Phone call from client RE status & advising of her contact with TranSouth & continuing refusal to turn over car unless storage bill is paid | 10 mn |
| 03/22/96 | Phone call from Xenobia Brown, TranSouth Representative RE advising OK to pick up car | 5 mn |
| 03/22/96 | Phone call from client RE advising of her attempts to pick up car & tow man, Russ Grubb, refused to release car unless storage bill is paid, pursuant to instructions from TranSouth | ¼ hr |
| 03/22/96 | Phone call to Russ Grubb, tow man & person holding car for TranSouth, advising he will not release car unless storage bill of $154.00 is paid | ¼ hr |
| 03/22/96 | Follow up phone call to Atty Steve Miles RE advising problem with storage bill & continued refusal to turn over car | ¼ hr |
| 03/22/96 | Follow up phone call received from Russ Grubb indicating further contact with TranSouth indicating they will pay storage bill & car may be released to debtor | 10 mn |
| 03/22/96 | Phone call to client RE advising car may now be picked up & no storage bill to be paid | 10 mn |
| 03/23/96 | Phone call to client RE advising she was able to pick up car this date at 5:00 pm | 5 mn |
| 03/30/96 | Receipt & review of Court Order RE hearing on damages | ¼ hr |
| 03/31/96 | Phone conference with client RE establishing damages | ½ hr |
| 03/31/96 | Preparation of pleading RE establishment of damages | ¾ hr |
| 04/18/96 | Anticipated attendance at hearing on sanctions for violation of automatic stay (time spent also includes anticipated review of file with client, preparation & travel time) | 3 hr |